**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

| | | |
|---|---|---|
| **TIMOTHY D. JENSEN,** | ) | |
| | ) | |
| **Plaintiff-Claimant,** | ) | |
| | ) | **No. 10 CV 50312** |
| v. | ) | **Magistrate Judge** |
| | ) | **Iain D. Johnston** |
| **CAROLYN W. COLVIN, Acting** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant-Respondent.** | ) | |

## MEMORANDUM OPINION AND ORDER

In the early morning hours of July 30, 2008, Timothy D. Jensen ("Claimant") was drinking with friends on the northwest side of Chicago. R. 23 - 24. At that time, he was six feet, two inches tall and weighed about 300 pounds. R. 26, 280. He is right hand dominant. R. 18. Although the Claimant previously worked as a bartender and bouncer, on July 30, 2008 and for some time before then, he was unemployed. R. 18, 78, 162, 168, 186, 220. The Claimant became intoxicated. R. 23, 223, 232, 252. Indeed, the Claimant's blood alcohol level was .19. R. 23, 228. The Claimant put his right arm through a window. R. 234. The medical records indicate that the Claimant punched the window. R. 227, 232. But the Claimant asserts he fell into the window. R. 22, 31. Regardless of how he put his arm through the window, the consequence was traumatic. The Claimant suffered severe injuries, including trauma to his brachial artery and vein. R. 229, 232, 234, 252. But these injuries were not severe enough to prevent the Claimant from driving. In fact, the Claimant drove from his home in Crystal Lake, Illinois to Wrigley Field to

1

attend a Cubs game, and then back home again, about a year after the incident. R.
71.  To meet friends, about four (4) months after the injury, the Claimant also drove
from his home to the northwest side of Chicago and back. R.65 – 67.  And the
Claimant drove from Crystal Lake to Evanston for his disability hearing, which is a
distance of about 100 miles round trip. R. 35, 70.  As a result of the injuries
suffered, the Claimant sought both Supplemental Security Income ("SSI") and
Social Security Disability Insurance Benefits ("DIB").  R. 15.  Both requests were
denied. R. 1.

The Claimant brings this action under 42 U.S.C. §405(g), seeking reversal or
remand of the decision by Respondent, Carolyn W. Colvin, Acting Commissioner of
Social Security ("Commissioner"),[1] denying the Claimant's application for SSI and
DIB under Title II of the Social Security Act ("SSA").  This matter is before the
Court on cross-motions for summary judgment. (Dkt. #18, 25).

The Claimant argues that the Commissioner's decision denying his
application for benefits should be reversed or remanded for further proceedings
because the Administrative Law Judge's ("ALJ") decision is not supported by
substantial evidence and is contrary to law.  The Commissioner argues that the
ALJ's decision should be affirmed because it is supported by substantial evidence.
For the reasons set forth more fully below, the Claimant's motion for summary
judgment is granted, and the Commissioner's motion is denied.  The matter is
remanded.

---

[1] Commissioner Carolyn W. Colvin has been automatically substituted as the Defendant-Respondent pursuant to Federal Rule of Civil Procedure 25(d).

2

# I. BACKGROUND

A. Procedural History

The Claimant filed an application for disability on August 29, 2008, alleging a disability onset date of July 30, 2008. R. 168, Dkt. #15, p. 2 - 3. The application was initially denied on October 3, 2008 and upon reconsideration on January 5, 2009. *Id.* The Claimant filed a timely request for a hearing on March 6, 2009. *Id.* On December 3, 2009, the ALJ conducted a hearing in Evanston, Illinois. *Id.* The Claimant, Medical Expert William Newman, M.D. and Vocational Expert James J. Radke testified at the hearing. R. 14.

On December 8, 2009, the ALJ issued a decision denying the claim for benefits. Dkt. #15, p. 3. The Claimant filed a timely request to review the ALJ's decision. On September 10, 2010, the Appeals Council denied the review, making the ALJ's decision the final decision of the Commissioner. *Id.* Thereafter, the Claimant filed this appeal pursuant to 42 U.S.C. §405(g).

B. Hearing Testimony Regarding Impairment

1. Claimant

Counsel represented the Claimant at his hearing on December 3, 2009. R. 15. At that hearing, Claimant testified that he is right hand dominant, had not worked since injuring his arm, and previously worked in the restaurant business. R. 18 – 19. The Claimant attended high school but did not graduate. R. 20. However, he obtained his GED and took a culinary arts class at Elgin Community College. R. 21 – 22.

3

The Claimant testified that he injured his arm (including cutting his brachial artery) when, after drinking with friends near Harlem or Central, he lost his balance and fell through a window. R. 22, 32. The Claimant testified that the hospital indicated that he had a blood alcohol level of .19. R. 23. At the time of the incident in July of 2008, the Claimant was 6' 2" and weighed nearly 300 pounds, but at the time of his hearing, the Claimant weighed about 270 pounds. R. 26. The Claimant was prescribed a brace for his arm and wears it. R. 26 The medical records indicate that the Claimant only wears the brace in public. R. 312.

At the hearing, the Claimant attempted to demonstrate the problems with his wrist. R. 27. Although the transcript is somewhat confusing, it appears that the Claimant does not have dorsiflexion in his right wrist, meaning he cannot lift it upwards, nor can he supinate. R. 27.

The Claimant testified that he does "not really" use his right arm, although he tries to use it. R. 34. For example, the Claimant tries to open doors by using the door knob, which he cannot do without wearing his brace. R. 34.

The Claimant testified that he is able to dress and undress himself. R. 34. But the Claimant testified that "it is kind of hard" for him to zip. R. 35.

The Claimant testified that he uses his left hand for personal care, such as brushing his teeth and washing. R. 35.

The Claimant testified that he is able to drive, and that he drove to the hearing. R. 35. The Claimant also testified that, after his injury, he began driving in early November 2008. R. 65. At that time, he met friends at a restaurant in

4

Northwest Chicago and he then drove home to Crystal Lake. R. 67. According to the Claimant, he "drove home good" and was able to safely and successfully drive. R. 67 – 68. But the Claimant also testified that his physical therapist said the Claimant should use a knob on the steering wheel. R. 68 – 69. At this point in the hearing, the vocational expert stated that the Rehabilitation Institute used driving knobs "a fair amount." R. 69. According to the Claimant, he only used his left arm to drive, and that on "normal weeks" he drove about 10 miles, but that during the week of the hearing, he drove over 100 miles. R. 70. The Claimant also admitted to driving to a Cubs game from his home in Crystal Lake. R. 71.

The Claimant testified that the only improvement to his injured arm that he noticed was that he had more grip strength with the brace on, and that his improvement has been "very slow." R. 64.

Upon questioning by the medical expert at the hearing, the Claimant stated that he was "not really [suffering] pain," but described his condition "more like stiffness." R. 37. The Claimant demonstrated that he could bend his elbow almost 100 degrees, and can straighten it. R. 37. The Claimant testified that he had swelling in his hand, but the medical expert commented that the swelling was not significant at that time. R. 38.

Upon questioning by his counsel, the Claimant testified that although he can cook for himself at home, he probably could not "take a ham out of the oven by himself" because he would need two hands. R. 59. The Claimant also testified that he was missing some muscle in his right forearm, and had no muscle strength in his

5

right forearm. R. 72 – 73. The Claimant testified that he washed his face with his left hand, and that it takes about one or two minutes to zip his coat with his left hand. R. 75. Although the Claimant can pick up a remote, he cannot use the buttons quickly. R. 76. Likewise, he cannot dial a phone quickly. R. 77. The Claimant further testified that he cannot write with his right hand because he cannot control the pen; as a result, he signs his name with his left hand. R. 77 – 78. Moreover, the Claimant cannot tie his shoes. R. 78. Additionally, he has difficulty counting money. R. 79. Although the Claimant cannot lift his dogs, he can pick up a five pound bag of cat food. R. 80.

    2. Medical Expert

    A medical expert, Dr. William Newman, testified at the hearing, after reviewing the Claimant's medical record and listening to the Claimant's testimony. R. 36, 39 – 48. He testified that the Claimant had injured his brachial artery, the brachial vein, the brachialis muscles, as well as the radial nerve. R. 39. In response to the ALJ's question of whether the Claimant's condition would meet or equal a listing, Dr. Newman noted that the medical records indicated that immediately after the Claimant's initial surgery, the Claimant developed a thrombosis that needed to be repaired. R. 40. Dr. Newman opined that no bony injury existed, that there was not currently "a lot of swelling," and that the Claimant was "doing pretty good." R. 40. Dr. Newman noted that the Claimant had radial nerve palsy, and that the Claimant could not dorsiflex, hyper-extend at the metacarpal phalangeal joints, or extend the right thumb. R. 40. But according to Dr. Newman, the Claimant could

extend the distal joints of the fingers and the thumb. R. 40.  As a result of these injuries, Dr. Newman opined that the Claimant had functional impairments, and could not, for example, open a door knob, but could close a door. R. 41. In finally answering the ALJ's question, Dr. Newman stated that for a closed period, he believed the Claimant's condition met a listing. R. 41 – 42. In response to questioning by the Claimant's attorney, Dr. Newman stated that a listing under Section 1.08 was met for one (1) year. R. 43.  Additionally, Dr. Newman stated that because of the injury, although the Claimant may have trouble grasping an item, the Claimant should not have difficulty holding on to the item. R. 44. Moreover, if the Claimant were to wear his brace, according to Dr. Newman, the Claimant should be able to grasp an item. R. 44 – 45. Dr. Newman acknowledged that the Claimant could not supinate, which would make it difficult for the Claimant to control an object once he grasps it. R. 45.

    3. Vocational Expert

    A vocational expert, James J. Radke, also testified at the hearing. R. 48 – 58. He testified that he read the Claimant's record and listened to his testimony. R. 48. Mr. Radke testified that the Claimant's previous employment as a bartender and cook required bimanual dexterity and coordination. R. 48.  The ALJ then questioned Mr. Radke and asked if unskilled jobs existed for a person could only use his dominant upper extremity as a guide but could fully use the other upper extremity, could operate an automobile and perform personal care. R. 49.  Mr. Radke stated that there were thousands of jobs that existed in Northeastern Illinois that such a

person could perform, including cashier, mail clerk, courier and security guard. R. 49.

On cross examination, Mr. Radke stated that in some instances a cashier may need two hands but it was not necessary. R. 51. Mr. Radke's belief was based upon personal observation. R. 51. In fact, Mr. Radke testified that he had seen a one-handed person work as a cashier. R. 55.

Upon further questioning by the ALJ, Mr. Radke testified that light unskilled level jobs existed for a person who only possessed the use of a non-dominant upper extremity (for example, a person whose dominant upper extremity had been amputated). R. 55. Mr. Radke testified that such jobs existed, although the number would be substantially reduced. R. 55. According to Mr. Radke, those types of jobs would include cashier, mail clerk, security and courier. R. 56. Mr. Radke believed that for the positions of cashier, mail clerk and security, the number of jobs existing in the region would be just under one thousand (1,000) positions, but that the number of courier jobs available would remain the same, namely three-thousand four hundred (3,400). R. 56. According to Mr. Radke, nationally, there would be about eleven (11) times that number of jobs. R. 57.

4. Closed Period Testimony and Discussion

Throughout the hearing, there were repeated discussions as well as testimony regarding whether the Claimant's injury would meet the requirements for a closed period. For example, Dr. Newman testified that the Claimant met a listing for a closed period. R. 42. Indeed, the ALJ repeatedly commented that the

Claimant's injuries may meet the requirements for a closed period. R. 42. For example, the ALJ stated, "[T]his is the type of case that . . . maybe we should view as a closed period matter." R. 43. At one point, the ALJ stated, "This is not the case for open-ended disability unless there's something here that we don't know about." R. 59. Commenting further, the ALJ later stated, "This is a classic case for a closed period. And, you know, if Timothy takes it, that's wonderful." R. 61. Thereafter, the ALJ retracted somewhat from his position, and the following exchange occurred between the ALJ and the Claimant's attorney:

ATTY:       Well, Your Honor, I understand if you want to give this a – make this a closed period. I don't think I can get my Claimant to agree to that, but –

ALJ:       Okay.

ATTY:       -- certainly if that's your Decision.

ALJ:       Okay. But you know, I'm just talking now. But then, you know, I'm going – if you don't want to agree, well, I just want to ask some more questions so I – and get some more evidence. But I can't guarantee that I'm going to grant the closed period because I'm going to have to make my ruling on all the evidence." R. 62 – 63.

Then the ALJ stated that "Based on what I have so far . . . I could do, you know, a closed period." R. 63. At this time in the hearing, the Claimant and his attorney

took a short recess to discuss whether the Claimant would agree to amend his application to seek a closed period, but the Claimant refused. R. 64.

C. Medical Evidence

The medical records indicate the following. On July 30, 2008, the Claimant suffered trauma to his right arm, including lacerating his radial nerve and brachial artery. R. 332 – 333. Surgery was performed, including a vein graft. R. 334. The graft thrombosed, requiring another surgery the next day. R. 337. On August 12, 2008, the Claimant was discharged, and was told to schedule follow up visits with Dr. Baxamusa, an orthopedist, and Dr. White, a vascular surgeon. R. 341.

On August 28, 2008, Dr. Baxamusa saw the Claimant. Dr. Baxamusa noted that the skin graft and fasciotomy wounds were well healed, but that the Claimant had significant swelling and a weak ability to flex his fingers. R. 345. Dr. Baxamusa noted that it was "likely [the Claimant] will have permanent impairment with respect to his hand, and as far as nerve recovery, this may take several months or even years to fully appreciate." R. 345.

A medical record signed by Dr. Petersen on September 1, 2008, indicated that the Claimant weighed 253 pounds. R. 272.

On September 22, 2008, Dr. Baxamusa again examined the Claimant, noting that he was "currently doing well." R. 346. During this examination, the Claimant told Dr. Baxamusa that he was playing Wii Sports, mostly with his left hand, and gaining more dexterity with his left hand. R. 346. The Claimant also said that he was playing "old-fashioned video games with his right hand in an attempt to gain

10

some dexterity in [h]is right hand." R. 346. Upon examination, Dr. Baxamusa noted moderate swelling, but that the Claimants fingers were warm and well perfused. He also noted that although the Claimant was weakly able to flex his fingers, he had difficulty making a fist. R. 346. Moreover, the Claimant had intact sensation in the fingers but was lacking radial nerve function. R. 346. Dr. Baxamusa noted that the Claimant may "have incomplete recovery despite attempts at nerve repair." Dr. Baxamusa indicated that the Claimant said he had no restrictions. R. 346.

On October 17, 2008, Dr. Petersen completed a State of Illinois Department of Human Services Medical Evaluation – Physician's Report. R. 360 – 365. In the report, Dr. Petersen indicated that the Claimant had full capacity to walk, bend, stand, stoop, sit, turn, speak and travel. R. 362. Dr. Petersen also indicated that the Claimant had full capacity for left finger dexterity. R. 362. But Dr. Petersen indicated that the Claimant had more than 50% reduced capacity to climb, push, pull, manipulate (fine and gross) and right finger dexterity. R. 362. As to the Claimant's ability to perform activities of daily living, Dr. Petersen indicated that the Claimant was limited due to the injury. R. 362.

In a medical record completed the same day, Dr. Petersen stated that the Claimant "is improving with range of motion of fingers however has no ability to use the right arm for work purposes currently." R. 363. In fact, twice in this document, Dr. Petersen indicated that the Claimant was unable to "currently" use his right arm for work purposes. R. 363 – 364. Dr. Petersen indicated that although

the Claimant had no range of motion of the right elbow (actively), he had a 25% range of motion in the wrist and all five right fingers. R. 363.

Medical records from November 5, 2008, indicated that the Claimant was able to don and doff his hat with his right arm. R. 314.

Medical records dated November 7, 2008 indicated that the Claimant stated he was using his right upper extremity to turn light switches on and off, pick up a remote, remove ice from the tray and for stability. R. 312.

On November 12, 2008, Dr. White – a vascular surgeon – examined the Claimant. R. 296. Dr. White noted that the Claimant "continues to do well and reports no symptoms suggestive of upper extremity ischemia." R. 296. Based upon the physical examination, Dr. White determined that there was "good movement of the fingers and strong distal pulses." R. 296. Dr. White found that the "Claimant has recovered well from his traumatic injury and surgical repair." R. 296. Dr. White noted that he intended to perform venous duplex imaging of the brachial artery and vein. Those tests were performed on November 21, 2008, which showed that the Claimant's brachial artery, brachial vein grafts and brachial veins were patent. R. 298.

On November 20, 2008, Dr. Petersen examined the Claimant and wrote in the medical records that the Claimant was "making some progress," but that "it [was] slow." R. 365. Dr. Petersen further wrote, "The patient has some definite improvement over the last time I saw him. Specifics in regards to strength and range of motion are documented by occupational therapy." R. 365 – 366.

A December 10, 2008, medical document noted that the Claimant stated he used his right arm for gross motor skills, and that he was able to drive, but was unable to cut food. R. 349.

Dr. Petersen examined the Claimant on January 26, 2009. R. 367. Dr. Petersen's record states that the Claimant was "continuing occupational therapy and making some progress." R. 367.

On June 24, 2009, which was about eleven months after the accident, Dr. White examined the Claimant. R. 351. Dr. White wrote that the Claimant reported that he had no significant problems from a vascular perspective, and that he demonstrated improved grip strength. R. 351. But, according to Dr. White, the Claimant had no extension of his right hand or fingers. R. 351. Dr. White note that the Claimant's right arm was warm and well perfused, with a palpable radial pulse, and that the Claimant had good venous outflow signals in his right brachial vein. R. 351.

On August 25, 2009, Dr. Petersen answered "Listing 1.02(B) Interrogatories," in which he stated that he last treated the Claimant in January 2009 – seven (7) months earlier. R. 352. Dr. Petersen stated that the Claimant could not use his right upper extremity to sustain such functions as reaching, pushing and pulling. R. 352. Dr. Petersen also noted that the Claimant could not use his right upper extremity to pick up a box, turn a door knob, do other gross movements effectively, nor tie shoelaces, button a shirt, write or do other fine movements effectively. R. 353. According to Dr. Petersen's answers, the Claimant could not use his right

upper extremity to open cans and bags, move full pots and pans or otherwise prepare a simple meal for himself; could not wash and style his hair or otherwise effectively take care of personal hygiene by himself; could not sort and handle papers or files; and could not place files in a file cabinet at or above waist level. R. 354. Under "Additional comments," Dr. Petersen stated that the Claimant had minimal improvement over the past eight months, that his right arm was not functional in any of the identified tasks, that he had no grip, minimal range of motion at the wrist and limited ability to flex his elbow. R. 354. Dr. Petersen concluded by stating that the right arm and hand were severely compromised from a functional perspective, and that he did "not anticipate it will get much better." R. 354.

Dr. Petersen's August 25, 2009 notes reflect that the Claimant's condition had not changed much since January 2009. R. 371. Dr. Petersen also wrote that the Claimant had "essentially no ability to grip," that he had about 75% range of motion with flexion of his fingers and 75% - 80% extension in all five fingers. R. 372. According to Dr. Petersen's August 25, 2009 records, the Claimant's right wrist was severely limited in range of motion, with no dorsiflexion and limited supination, as well as limited elbow flexion. R. 372.

On July 29, 2009, a physical residual functional capacity assessment was completed by Dr. James Madison, and was memorialized in a report dated July 30, 2009. R. 288. The assessment stated that no treating or examining source statements regarding the Claimant's physical capacities were in the file. R. 294.

14

The assessment indicated that the Claimant could occasional lift and/or carry twenty (20) pounds, frequently lift and/or carry ten (10) pounds, stand and/or walk about six (6) hours in an 8-hour workday, and sit about six (6) hours in an 8-hour workday. R. 289. But the assessment indicated that the Claimant's ability to push and/or pull was limited in the upper extremities to only occasional pushing and pulling with the right upper extremity. R. 289. Moreover, the assessment indicated that the Claimant could occasionally balance, stoop and climb ramps and stairs, but never climb a ladder, rope or scaffold. R. 290. As for manipulative limitations, the assessment indicated that the Claimant was limited to occasional reaching, handling, fingering and feeling with his right upper extremity due to residual effects of the injury. R. 291. The assessment noted that the Claimant had no visual or communicative limitations. R. 291. The assessment found that no environmental limitations existed except for hazards. R. 292. Dr. Madison found that the Claimant was "partially credible," and that medical evidence indicated that the repair and healing of the right arm was "underway," with a "recovery, at least in part, of the claimant [being] anticipated." R. 293, 295. Dr. Madison noted that the Claimant had full use of his left arm. R. 293, 295.

The Claimant requested reconsideration of the RFC assessment. R. 328 – 330. Dr. Charles Kenney reviewed the evidence in the file and affirmed the RFC, with a revision. R. 329. According to Dr. Kenney, the evidence showed that the Claimant's surgery was successful and that he was doing well. R. 330. Dr. Kenney wrote that on reconsideration, the Claimant did not allege any new illnesses or

worsening of his injuries, and that additional evidence showed no change in the Claimant's condition from the initial review. R. 330. Dr. Kenney concluded by indicating that "Reports show his condition is improving." R. 330.

D. ALJ's Decision

First, the ALJ found that the Claimant met the insured status requirements of the SSA through December 31, 2012. R. 93. Second, the ALJ found that the Claimant had not engaged in substantial gainful activity since July 30, 2008. R. 93. Third, the ALJ found that the Claimant had the following severe impairments: (a) right brachial artery and vein trauma, and (b) obesity. R. 93. Fourth, the ALJ found that these impairments did not meet or equal one of the listed impairments. R. 93-4. Fifth, the ALJ found that the Claimant had a residual functional capacity ("RFC") as follows: the Claimant could perform light work, except that "his right dominant upper extremity is only available as a guide." R. 94. The ALJ further found that the Claimant was able to operate a motor vehicle safely and that the Claimant's left upper extremity was fully available for work. R. 94. In making the RFC determination, the ALJ found that "the objective findings in this case fail to provide strong support for the claimant's allegations of disabling symptoms and limitations." R. 95. The ALJ repeatedly, and not surprisingly, focused on the Claimant's ability to drive a vehicle, noting that the Claimant drove from Crystal Lake to Evanston for the hearing (which is approximately 40 miles each way), drove to Chicago for a Cubs game, and drives about ten miles per week. R. 94, 96. With respect to RFC finding, the ALJ specifically refused to give the opinion of Dr. Brent

16

Petersen – the Claimant's family practitioner – "great weight" because (a) Dr. Petersen is a family practitioner, not a vascular, orthopedic or neurological specialist, and (b) Dr. Petersen's opinions were "not consistent with the claimant's admitted abilities or the record as a whole." R. 97. The ALJ did not elaborate on these two points. Likewise, the ALJ refused to give Dr. Newman's opinion "great weight" because (a) Dr. Newman was "never able to actually examine the claimant and he did not have any sort of treatment relationship with the claimant;" and (b) Dr. Newman's opinion was "inconsistent with the claimant's admitted abilities and the entire record." R. 97. Again, the ALJ did not elaborate on these two points. Instead, the ALJ relied upon the opinion of Dr. James Madison, the State agency physician, who found that the Claimant was "capable of performing a reduced range of light work." R. 98. The ALJ gave "great weight" to Dr. Madison's opinion because he "was able to review the record as a whole" and the opinion was "consistent with the claimant's admitted abilities and other evidence." R. 98.

Importantly, as noted above, the ALJ's RFC finding was that the Claimant was limited to "light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that his right dominant upper extremity is only available as a guide." R. 94. But in his discussion supporting this RFC finding, the ALJ also noted that the Claimant was obese because he was 6' 2", weighing 299 pounds. R. 96. This finding is consistent with the ALJ's finding that one of the Claimant's severe impairments was obesity. R. 93. The ALJ specifically stated that he considered the limitations

17

caused by the Claimant's obesity by limiting the Claimant to "less than light work activity." R. 96.[2]

## II. LEGAL STANDARDS

A. Standard of Review

A reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. §405(g). This much is clear regarding the standard of review. If supported by substantial evidence, the Commissioner's factual findings are conclusive. 42 U.S.C. §405(g). If the Appeals Council denies a request for review, the ALJ's decision becomes the Commissioner's final decision, reviewable by the district court. *Sims v. Apfel*, 530 U.S. 103, 106-07 (2000). But beyond these axiomatic statements, the courts have provided seemingly conflicting guideposts.

At one end of the spectrum, court opinions have held that the standard of review is narrow. *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (review is "extremely limited"). The district court's review is limited to determining whether substantial evidence supports the Commissioner's decision and whether the Commissioner applied the correct legal standard in reaching the decision. *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009); *Schoenfeld v. Apfel*, 237 F.3d 788, 792

---

[2] At one location, the ALJ's decision states that the Claimant has "limited use of his left arm." R. 95. This statement is clearly a typographical error. Initially, despite representations in the Claimant's brief, nothing in the entire record, including the transcript of the hearing, contains even the hint that the Claimant's left arm is of limited use. Moreover, a simple review of the record indicates that the ALJ's reference is to a document that states that the Claimant was "limited to use left arm only." R. 211. The Claimant's attempt to seize on this error is unfortunate and meritless. Dkt. #27 at 10.

(7th Cir. 2001). Substantial evidence exists if there is enough relevant record evidence that would allow a reasonable mind to determine that the decision's conclusion is supportable. *Richardson v. Perales*, 402 U.S. 389, 399-401 (1971). Accordingly, the reviewing court cannot displace the decision by reconsidering facts or evidence, or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Indeed, on review, the courts will give the decision a commonsensical reading and not pick nits. *Rice v. Barnhart*, 389 F.3d 363, 369 (7th Cir. 2004). Moreover, a decision need not provide a complete written evaluation of every piece of testimony and evidence. *Pepper v. Colvin*, 712 F.3d 351, 362 (7th Cir. 2013). If reasonable minds could differ concerning whether a claimant is disabled, then the court must affirm so long as the decision is adequately supported. *Elder*, 529 F.3d at 413.

At the other end of the spectrum, courts, including the Seventh Circuit, have been careful to emphasize that the review is not merely a rubber stamp. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002). For example, a "mere scintilla" is not substantial evidence. *Id.* Moreover, a reviewing court must conduct a critical review of the evidence before affirming the Commissioner's decision. *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008). If the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, then the court must remand the matter. *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). Moreover, even when adequate record evidence exists to support the Commissioner's decision, the decision will not be affirmed if the Commissioner does not build an accurate and

19

logical bridge from the evidence to the conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008); *Scott v. Barnhart*, 297 F.3d 589, 595-96 (7th Cir. 2002); *Steele v. Barnhart*, 290 F.3d 936, 941 (7th Cir. 2002); *Sarchet v. Carter*, 78 F.3d 305, 307 (7th Cir. 1996).[3] And, unlike most civil litigation in which a decision can be affirmed on any basis in the record, federal courts cannot do so in Social Security appeals. *Compare Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010) ("[T]he *Chenery* doctrine . . . forbids an agency's lawyers to defend the agency's decision on grounds that the agency itself had not embraced.") *with Brosted v. Unum Life Ins. Co.*, 421 F.3d 459, 467 (7th Cir. 2005) ("[W]e can affirm on any basis in the record"). Therefore, the Commissioner's counsel cannot build for the first time on appeal the necessary accurate and logical bridge. *See Parker*, 597 F.3d at 925; *Toft v. Colvin*, 2013 U.S. Dist. LEXIS 72876, *21 (N.D. Ill. 2013) ("[T]he court's review is limited to the reasons and logical bridge articulated in the ALJ's decision, not the post-hoc rational submitted in the Commissioner's brief.").

## B. Disability Standard

Disability insurance benefits are available to a claimant who can establish that he is under a "disability" as defined in the SSA. *Liskowitz v. Astrue*, 559 F.3d

---

[3] To further show the seeming conflict, scores of cases rely upon the "logical bridge" analysis and language to remand decisions to the Commissioner. *See, e.g. Shauger v. Astrue*, 675 F.3d 690, 697-98 (7th Cir. 2012); *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011); *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009). But the "logical bridge" analysis was never meant to compel a hypercritical approach. *Mueller v. Astrue*, 860 F.Supp.2d 615, 619 (N.D. Ill. 2012). Indeed, the Seventh Circuit has provided the following pedestrian explanation of how an ALJ's decision establishes a logical bridge: "[T]he ALJ must rest its denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade." *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008).

736, 739-740 (7th Cir. 2009). "Disability" means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). An individual is under a disability if he is unable to perform her previous work and cannot, considering his age, education and work experience, participate in any gainful employment that exists in the national economy. 42 U.S.C. §423 (d)(2)(A). Gainful employment is work usually done for pay or profit, regardless of whether a profit is realized. 20 C.F.R. §404.1572(b).

The ALJ uses a five-step analysis to determine whether a claimant is disabled. 20 C.F.R. §404.1520(a)(4)(i – v). Under this analysis, the ALJ must inquire in the following order: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's severe impairment meets or equals a listed impairment; (4) whether the claimant can perform past relevant work; meaning whether the claimant can still work despite the claimant's physical and mental limitations, which is referred to as the claimant's residual functional capacity ("RFC"); *see Hickman v. Apfel*, 187 F.3d 683, 689 (7th Cir. 1999); 20 C.F.R. §404.1545(a), (b); and (5) whether the claimant is capable of performing work in light of the claimant's age, education and work experience. *Id.*; *see also Liskowitz*, 559 F.3d at 740. After the claimant has proved that he cannot perform his past relevant work due to the limitations, the Commissioner carries the burden of showing that a significant number of jobs exist

21

in the national economy that the claimant can perform. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

## III. DISCUSSION

A. Contentions of the Parties

In asserting that the ALJ's decision was not supported by substantial evidence, the Claimant contends that the matter should be remanded because the ALJ made an erroneous RFC determination due to his treatment of the medical opinions, and failed to properly consider the Claimant's obesity and pace limitations.

The Commissioner contends that the ALJ reasonably weighed the opinions of Dr. Petersen and Dr. Newman, and reasonably relied on the opinions of Dr. Madison.

B. Analysis

1. Bases for Remand

A review of the entire record currently before this Court would allow it to affirm the denial of benefits, if the ALJ's analysis were not faulty. The Seventh Circuit has clearly held that even if the administrative record would support the denial of benefits, this Court is not authorized to essentially re-write the ALJ's analysis and decision. *Berger*, 516 F.3d at 544; *Scott*, 297 F.3d at 595-96; *Steele*, 290 F.3d at 941; *Sarchet*, 78 F.3d at 307. This Court fully understands the ALJ's attempt to create a RFC that was most beneficial to the Claimant. Indeed, the ALJ's hypothetical came close to assuming that the Claimant's right arm had been

22

amputated, and only limited the right arm's usefulness to a guide. R. 55. And possessing only one arm (even a non-dominant one) does not, by itself, make a person disabled. *See Jones v. Shalala*, 10 F.3d 522, 526 (7th Cir. 1993) ("Claimants with the use of only one arm are not automatically entitled to disability benefits.").[4] Moreover, the record evidence fully establishes that the Claimant is capable of driving a vehicle, and does so when he seeks entertainment. R. 35, 65 – 67, 70 – 71.[5] But because the ALJ's analysis fails to present a logical bridge supporting the denial of benefits, this Court is obligated to remand the matter.

The ALJ's analysis fails in four respects. First, the ALJ found that the opinions of Claimant's treating physician – Dr. Petersen – were "not afforded great weight." R. 97. Initially, the Court is unsure what that phrase means precisely. Although one could interpret the phrase "not afforded great weight" to mean a number of possibilities, in the context of the ALJ's opinion, this phrase essentially meant "rejected." The ALJ provided two bases for rejecting Dr. Petersen's opinions: first, Dr. Petersen was a family practitioner, not a vascular, orthopedic, or neurological specialist; and second, according to the ALJ, Dr. Petersen's opinions

---

[4] Surprisingly, the Commissioner's brief failed to cited *Jones* or other relevant cases regarding claimants with the use of only one upper extremity as well as the ability of individuals with this impairment to drive vehicles. *See Jones*, 10 F.3d at 526 ("VE testified that he personally had placed one-armed individuals in the types of jobs he described for Jones.").

[5] The Claimant repeatedly cited *DeFrancesco v. Bowen*, 867 F.2d 1040, 1044 (7th Cir. 1989) regarding his ability to drive. However, the facts, as well as the concerns the court raised, of that case are easily distinguishable. In that case, the claimant's disability could potentially cause him to depress the accelerator rather than the brake, which is an obvious and legitimate concern. Here, no such concerns were raised, and in fact, the Claimant repeatedly testified he could drive safely, which is consistent with Seventh Circuit case law. *See Heldenbrand v. Chater*, 1997 U.S. App. LEXIS 35559, * 28 (7th Cir. 1997) ("And driving obviously can be done with one hand.").

23

were not consistent with the Claimant's admitted abilities or the record as a whole. R. 97. As to the first basis, the ALJ chose to rely on the opinion of Dr. Madison. But Dr. Madison was not a treating physician, and he simply reviewed only some of the records, which alone is an improper basis to reject Dr. Petersen's opinion. *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003) (a contradictory opinion of one non-examining physician is not, by itself, substantial record evidence allowing an ALJ to reject an examining physician's opinion). Moreover, there is no evidence anywhere in the record showing that Dr. Madison was "a vascular, orthopedic, or neurological specialist." If Dr. Petersen's opinions were rejected because he did not possess one of those specialties, then certainly the physician upon whom the ALJ relied should be required to be a similar specialist. As to the second basis, the ALJ fails to provide a single example to support his conclusion that Dr. Petersen's opinions were not consistent with the record as a whole or the Claimant's admitted abilities. Upon reviewing the record, this Court can certainly find several examples to support the ALJ's conclusion, and in fact, has identified some of those examples in this opinion. But this Court is not authorized to build the ALJ's logical bridge for him. *Berger*, 516 F.3d at 544; *Scott*, 297 F.3d at 595-96; *Steele*, 290 F.3d at 941; *Sarchet*, 78 F.3d at 307; *see also Toft*, 2013 U.S. Dist. LEXIS 72876, *21.

Second, the ALJ also found that Dr. Newman's opinion was "also not given great weight." Again, based on the ALJ's entire decision, this phrase can only be interpreted as meaning that he rejected Dr. Newman's opinion. The ALJ gave three (3) reasons for rejecting Dr. Newman's opinions: first, Dr. Newman "was never able

24

to actually examine" the Claimant; second, Dr. Newman "did not have any sort of treating relationship with the claimant;" and third, again according the ALJ, Dr. Newman's opinions were inconsistent with the Claimant's "admitted abilities and the entire record." R. 97. The first and second justifications for rejecting Dr. Newman's opinions are logically inconsistent with his rejection of Dr. Petersen's opinions. Dr. Petersen examined and treated the Claimant, but the ALJ nevertheless rejected his opinions. The ALJ cannot then use the lack of examination and treating history as a basis to reject Dr. Newman's opinions. Moreover, as the medical expert, per Social Security regulations, Dr. Newman *could not* examine the Claimant. 20 C.F.R. §404.1526 ("The ALJ will not ask or allow the ME to conduct any type of physical or mental status examination of the claimant during the hearing."). The third justification is insufficient for the same reason it was insufficient in rejecting Dr. Petersen's opinions. The ALJ failed to cite a single example of how Dr. Newman's opinion was inconsistent with the Claimant's admitted abilities and the entire record. Again, this Court is not authorized to incorporate those missing planks in the ALJ's required logical bridge. *Berger*, 516 F.3d at 544; *Scott*, 297 F.3d at 595-96; *Steele*, 290 F.3d at 941; *Sarchet*, 78 F.3d at 307; *see also Toft*, 2013 U.S. Dist. LEXIS 72876, *21.

Third, the ALJ chose to give Dr. Madison's opinions "great weight". R. 98. In other words, the ALJ chose to accept Dr. Madison's opinions and reject Dr. Petersen's and Dr. Newman's opinions. The ALJ credited Dr. Madison's opinions for two reasons. First, according to the ALJ, Dr. Madison "was able to review the

record as a whole". Second, Dr. Madison's opinions were "consistent with the claimant's admitted abilities and other evidence." R. 98.

The first reason is faulty for two reasons. First, Dr. Madison's assessment stated that no treating or examining source statements regarding the Claimant's physical capabilities were in the file that he reviewed. R. 294. Second, unlike Dr. Madison, Dr. Newman did, in fact, review the Claimant's entire record. R. 36. Accordingly, Dr. Madison was in no greater position than Dr. Petersen, and indeed was in a lesser position than Dr. Newman to provide an opinion, at least with respect to reviewing the medical records. Second, again, the ALJ failed to provide a single example as to how Dr. Madison's opinions were consistent with the Claimant's abilities or other evidence. Moreover, like Dr. Newman – whose opinion the ALJ rejected – Dr. Madison likewise did not examine the Claimant or have a treating relationship with the Claimant. Finally, and most importantly, as noted previously, the Seventh Circuit has held that an ALJ cannot simply rely upon the opinion of a "State agency physician" to reject the opinion of a treating physician. *Gudgel*, 345 F.3d at 470.

Fourth, the ALJ's decision is inconsistent in its RFC finding, specifically as it relates to the Claimant's alleged obesity. Initially, although essentially ignored by the Claimant and his counsel at the hearing, the ALJ specifically found that the Claimant's obesity was a severe impairment. R. 93. Subsequently, the ALJ also found that the Claimant's RFC was "to perform light work . . . except that his right dominant upper extremity is only available as a guide." R. 94. However, when the

26

ALJ's decision addressed the Claimant's obesity, the ALJ wrote the following: "The claimant's obesity has been taken into consideration in the limitations assessed and the determination that the claimant has been limited to less than light work activity." R. 96. (Emphasis added.) Accordingly, the RFC finding is inconsistent: at one point, the RFC is light work, but at another point, the RFC is "less than light work," which means sedentary work. And if the Claimant is, in fact, limited to sedentary work, then as highlighted by the Claimant, his job prospects are much more limited as he has lost the use of his right upper extremity. 20 C.F.R. §404.1567; SSR 83-10 ("Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions."); SSR 83-14 ("The bulk of unskilled sedentary jobs requires bilateral manual dexterity."); *but compare* SSR 96-9p ("Therefore, even though 'sedentary work' represents a significant restrict range of work, this range in itself is not so prohibitively restricted as to negate work capability for substantial gainful activity in all individuals."); ("Limitations or restrictions on the ability to push or pull will generally have little effect on the unskilled sedentary occupational base.") *with* ("Most unskilled sedentary jobs require good use of both hands and the fingers; i.e., bilateral manual dexterity."). As noted below, on remand, this inconsistency must be resolved. And once the inconsistency is resolved and the appropriate RFC determination is provided, the ALJ must ensure that the hypothetical provided to the VE is accurate.

2. Considerations on Remand

In light of the required remand, several issues need to be addressed by the ALJ. On remand, the ALJ should (1) address how the Claimant's alleged severe obesity affects the Claimant's upper right extremity impairment, (2) consider the Claimant's pace in performing certain activities and, if necessary, (3) explicitly assess the Claimant's credibility.

With regard to obesity, the ALJ specifically found that it was a severe impairment, and, as noted above, attempted to factor the alleged obesity into the RFC. R. 93, 96. Had the ALJ not done so, this Court would not have found the above stated reason as a basis for reversal, particularly because the Claimant failed to specify – or even address – how the alleged obesity impaired his ability to work. *See Prochaska v. Barnhart*, 454 F.3d 731, 736-37 (7th Cir. 2006). Indeed, the Claimant's alleged obesity appears almost an after-thought, used as a belated basis – albeit correctly – to obtain a remand of the decision. There was very little, if any, discussion of the Claimant's alleged obesity at the hearing. On remand, if the ALJ finds that the Claimant is obese and the Claimant specifies how the obesity impairs his ability to work, the ALJ must consistently incorporate that finding and specification into the RFC.

Moreover, in light of the testimony regarding the length of time it takes for the Claimant to perform certain activities, the ALJ must consider pace as a factor in determining the Claimant's RFC. *See Jelinek v. Astrue*, 662 F.3d 805, 813 (7th Cir.

28

2011) (ALJ must provide VE with complete picture of claimant and VE must consider pace in determining existence of jobs).

It should be noted that the ALJ did not make a specific credibility finding regarding the Claimant. But the ALJ's opinion implicitly discredited the Claimant. On remand, if the ALJ disbelieves the Claimant's testimony, the ALJ must specifically say so and articulate the reasons why he does not credit the Claimant's testimony. *See Prochaska*, 454 F.3d at 738; *Schrocter v. Sullivan*, 977 F.2d 391, 394-95 (7th Cir. 1992). Although not referenced by the ALJ there are many bases for discrediting the Claimant's credibility. Three examples quickly come to the attention of this Court. First, the Claimant clearly minimized his intoxication, which caused his injury. The Claimant testified that although he had been drinking, he was not as intoxicated as indicated. R. 23. However, the medical records establish that the Claimant was intoxicated, and possessed a blood alcohol level of .19. R. 228, 223, 232, 252. The Claimant nonsensically attempted to explain the alleged misreading of his blood alcohol level by asserting that he had lost a large amount of blood at the time of the injury. R. 23. Second, the record shows that although the Claimant asserted that he could not take off his hat with his right hand, R. 197, his physical therapist noted that the Claimant did so, R. 314. Third, although the Claimant indicated – and certified – that he was working up to the date of his injury, R. 162, 186, the record shows that he had been unemployed at the time of the injury, R. 168, 178, 220. If, on remand, the ALJ discredits the

29

Claimant's testimony, the ALJ must comply with SSR 96-7p and consider the entire case record. *See Prochaska*, 454 F.3d at 738.

Finally, the Court is also obligated to discuss the issue relating to the closed period. First, the Claimant refused to amend his application to seek a closed period. R. 64. Second, the closed period provision simply does not apply. As the Commissioner argued, an element of a closed period finding is that there must be "continuing surgical management," which is defined as "surgical procedures and any other associated treatments related to the efforts directed toward the salvage and restoration of functional use of the affected part." Section 1.08. Here, no continuing surgical management occurred. The Claimant had follow-up surgery immediately after his initial surgery because the vein graft thrombosed, but there is no evidence of additional surgical procedures or treatments thereafter. In fact, Dr. Petersen stated that the Claimant was not "under continuing surgical procedures, post-surgical procedures, surgical complications, infections, or other medical complications, related illnesses, or related treatments directed toward the salvage or restoration of functional use of the affected body part." R. 352. In his reply brief, the Claimant completely failed to address the Commissioner's argument in this regard.

## IV. CONCLUSION

For the reasons stated above, the Claimant's motion for summary judgment is granted, and the Commissioner's motion for summary judgment is denied. The matter is remanded to the Commissioner.

It is so ordered.

Entered: September 23, 2013

Iain D. Johnston
U.S. Magistrate Judge